In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-3587

KELLY S. COOLIDGE,

*Plaintiff-Appellant,*

*v.*

CONSOLIDATED CITY OF INDIANAPOLIS
AND MARION COUNTY,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 04 C 1240—**Sarah Evans Barker**, *Judge.*

ARGUED SEPTEMBER 12, 2007—DECIDED OCTOBER 16, 2007

Before POSNER, FLAUM, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* This appeal arises out of
Kelly Coolidge's second lawsuit charging her former
employer, the Indianapolis-Marion County Forensic
Services Agency, also known as the Crime Lab, with sexual
harassment and retaliation. She won the first law-
suit—which is not before us on appeal—when a jury
concluded that the Crime Lab stood by while her super-
visor, David Willoughby, sexually harassed her with
coarse propositions and unwelcome fondling. (The jury
awarded $300,000 in damages but the parties settled in
exchange for the defendants' dropping their appeal.) She
didn't win the present suit. She sued Indianapolis and

Marion County claiming that Willoughby continued harassing her after his retirement by leaving behind pornography where she would find it, and that the city retaliated against her for filing the first lawsuit and EEOC complaints by refusing to promote her and by reprimanding and then firing her. The district court granted summary judgment to the defendants, and Coolidge appealed. Because the pornography did not create a hostile work environment, and because she cannot make out a prima facie case of retaliation, we affirm.

Coolidge's first claim is that the Crime Lab presided over a hostile work environment by failing to prevent Willoughby—who retired in December 2002—from leaving behind two pornographic videotapes for her to discover. The Crime Lab maintains a video cabinet containing evidence from various criminal cases, and in August 2003, Coolidge set about cleaning and reorganizing the cabinet in order to make space for some new blank tapes. She found a half-dozen unlabelled tapes, which was unusual because the Crime Lab has a practice of marking video-tapes with the appropriate case name and number. Coolidge briefly viewed the tapes to determine their contents. Several were indeed Crime Lab videos containing evidence, but two—the first marked "special" in Willoughby's handwriting; the second marked "X"—contained pornography. Coolidge viewed them just long enough to ascertain their ghastly contents: one of the videos, called "Nekromantik 2," depicted necrophilia as well as other violent and disturbing images. Coolidge turned off the video, became nauseous, and reported what she had seen to a colleague. She then took the tapes to her attorney, who made copies as a way to preserve what Coolidge believed to be further evidence of sexual harassment, and then returned them to the Crime Lab. Several weeks later, she reported the incident to a supervisor, who investigated the matter by calling Willoughby to ask

whether the tapes were his. Willoughby denied any knowledge.

This claim raises the interesting issue whether the sexual harassment from the prior lawsuit can be considered as context for this alleged incident of harassment. After all, the Supreme Court has emphasized that in hostile work environment claims, "the actionable wrong is the environment, not the individual acts that, taken together, create the environment." *Ledbetter v. Goodyear Tire & Rubber Co.*, 127 S. Ct. 2162, 2175 (2007). In the context of statutes of limitation, so long as an act of harassment occurs within the limitations period, other harassment outside the limitations period can also come in. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-17 (2002); *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 385 (7th Cir. 2007). Coolidge should not, of course, be allowed to collect double damages by recovering in this suit for the acts of harassment that led to the earlier jury verdict. But she contends that it was one continuous hostile work environment, and that the district court in the first case would not allow her to add the pornography incident to that suit, where it belonged.

We need not explore this issue further, for even considered in light of the earlier harassment, the video incident does not create a hostile work environment. The encounter was brief and not particularly severe—Crime Lab employees frequently worked with corpses, so pornography depicting necrophilia might not have the same shocking overtones there as it would in another setting. *See Whittaker v. Northern Illinois Univ.*, 424 F.3d 640, 645-46 (7th Cir. 2005); *McPherson v. City of Waukegan*, 379 F.3d 430, 438-39 (7th Cir. 2004); *cf. Fairbrother v. Morrison*, 412 F.3d 39, 50-51 (2d Cir. 2005) (*pervasive* presence of pornography contributed to hostile work environment), *abrogated on other grounds by Burlington*

*Northern & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405 (2006). Moreover, even if the pornography was severe enough, Willoughby had been retired from the Crime Lab for nearly a year when Coolidge discovered it. It would be onerous to require employers to conduct a thorough search of the premises to make sure a retiring employee didn't leave anything nasty behind. And although Coolidge perhaps had good reason to believe that the tapes *were* Willoughby's—it came out during the first trial that in his job as a forensic scientist, Willoughby manipulated corpses in sexually suggestive ways, hence the tie to necrophilia—no evidence shows that they were meant for her, or even left in a place where she was more likely to find them than others. (The video library was used by several Crime Lab employees.) Although Willoughby did not need to target Coolidge in order for her to prevail, *Yuknis v. First Student, Inc.*, 481 F.3d 552, 554-55 (7th Cir. 2007), we believe that the chain of events here was too attenuated to show that Willoughby sexually harassed Coolidge by leaving the tapes and hoping she would find them, and that the Crime Lab was responsible for failing to prevent this.

Coolidge next claims that the Crime Lab retaliated against her for her EEOC complaints and lawsuit by refusing to promote her to Willoughby's former position as head forensic scientist after he retired. *See* 42 U.S.C. § 2000e-3(a) (prohibiting discrimination against an employee because of her participation in a Title VII "investigation, proceeding, or hearing"). The Lab instead hired Sammi Mekki for that job. Coolidge attempts to prove retaliation both directly and indirectly, but fails on both fronts. Her basic argument boils down to this: she was qualified for the job and Mekki wasn't. This, she contends, is circumstantial evidence of retaliation (under the direct method of proof), as well as proof of a similarly

situated non-complaining employee who was more favorably treated (under the indirect method). *See generally Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 459 (7th Cir. 2007). But she is wrong on both counts, for Mekki was qualified for the job, and she was not. Mekki had earned a bachelor's degree and some post-graduate certifications, and had nine years of experience as a forensic scientist. This comported with the job's minimal qualifications: "A BA/BS degree with four years forensic science experience." Coolidge, by contrast, did not have the requisite four years' experience, having worked as a forensic scientist for only two years at the time the position became available, and as a "morgue liaison" for several years before that. Coolidge tries to chip away at Mekki's qualifications by repeatedly stating that his bachelor's degree came from an "unrecognized university in the foreign country of Sudan." By whom the university is unrecognized is unclear; what is clear, however, is that the job description does not discriminate between foreign and domestic degrees, so this point is irrelevant. Coolidge's failure-to-promote claim therefore fails.

Coolidge's final claim is that the Crime Lab retaliated against her by twice reprimanding her and then firing her after a third infraction. She attempts to prove retaliation through the indirect method, by which she must show that "after [s]he complained of discrimination, [s]he, and not any other similarly situated employee who did not complain, was subject to an adverse employment action although [s]he was performing up to the employer's legitimate job expectations." *Id.* The city concedes that Coolidge complained and that she was meeting its legitimate expectations, but halfheartedly argues that the two reprimands were not adverse employment actions. In firing her, her supervisor gave as his reason the two reprimands and a third incident. The reprimands therefore were accompanied by another job action—a

firing—even if it came later, and constitute adverse employment actions. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 902 (7th Cir. 2003); *Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001).

But again, Coolidge cannot point to a similarly situated employee who didn't complain and got a better shake. She was reprimanded essentially three times, and the Crime Lab cited these as grounds for a firing. Specifically, she was written up for (1) taking the two pornographic videotapes to her lawyer to make copies, in order to preserve evidence of harassment; (2) failing to take a blood stain sample from evidence obtained during a rape kit exam; and (3) taking a page from a Crime Lab case file to her lawyer for photocopying, in order to show that while she had been disciplined for the rape kit blunder, Mekki had not been reprimanded after he fingerprinted the wrong corpse. The city contends that Mekki was not a similarly situated comparator since he was not reprimanded; Coolidge answers that her reprimands were bogus, and that Mekki should have been disciplined but wasn't.

Although this is a close question, we agree with the district court that summary judgment was proper. Coolidge's three reprimands set her apart from Mekki, who received none, and the reprimands form a legitimate, nondiscriminatory basis for the firing. The first reprimand, for taking the videotapes to her lawyer for copying, stems from a policy that prohibits removing county property from county premises. Strong considerations clearly underlie such a policy: the Crime Lab stores evidence for use in criminal investigations and prosecutions, so it wouldn't do to have employees constantly removing and returning items for personal reasons. Coolidge contends that the pornography was Willoughby's *personal* property, and therefore could be safely taken home, but she took it before this could be ascertained—before she re-

ported it to her boss and he investigated. Evidence showed that pornographic videotapes do occasionally make their way through the Crime Lab as part of criminal investigations, so Coolidge's assumption that the tapes were not Crime Lab property was not necessarily true.

The second reprimand was also legitimate. Coolidge does not contest that she failed to take a blood sample from the rape kit exam, and instead merely points to Mekki's similar mistake in fingerprinting the wrong corpse. But Mekki had an explanation—that someone else had placed the wrong toe tag on the body that he fingerprinted—whereas Coolidge offers none. The third incident leading to Coolidge's firing was her removal of a page from an official case file that Mekki had worked on; Coolidge discovered the page while peer reviewing Mekki's performance. The page contains a note from Mekki's and Coolidge's boss that Mekki had fingerprinted the wrong body. Coolidge took this page from the case file and provided it to her lawyer as proof that she had been more harshly punished than Mekki. But this again transgressed the county's prohibition on removing Crime Lab property, and arguably was a more serious infraction because Coolidge does not appear to have returned the page, which could constitute evidence in a criminal investigation. Testimony showed that the body Mekki incorrectly fingerprinted was the subject of an "active, pending homicide trial," and if an issue of mistaken identity arose, the note could be critical. And even if that scenario did not come to pass, one can imagine that allowing employees to remove pages from an official case file without returning them could cause all sorts of problems for the lab.

Since Mekki was not similarly situated to Coolidge, she cannot make out a prima facie case of retaliation, and this claim too was properly terminated at the summary judgment stage. The district court's decision is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*