[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-10416
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 11, 2012
JOHN LEY
CLERK

D.C. Docket No. 2:09-cv-01321-WMA

REGINALD JONES,

Plaintiff-Appellant,

versus

UPS GROUND FREIGHT,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(June 11, 2012)

Before CARNES, PRYOR and RIPPLE,* Circuit Judges.

RIPPLE, Circuit Judge:

Reginald Jones brought this action against UPS Ground Freight, Inc.

_____

* Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

("UPSF"), his former employer, on July 1, 2009. Mr. Jones alleged that he had been subjected to a racially hostile work environment in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.[1] The district court entered summary judgment in favor of UPSF on December 30, 2010, and Mr. Jones timely appealed.[2] We conclude that, on the summary judgment record before us, a reasonable trier of fact could conclude that the events alleged by Mr. Jones created an objectively hostile work environment. Accordingly, we vacate the judgment of the district court and remand the case for further proceedings consistent with this opinion.

# I

## BACKGROUND

### A. Facts

#### 1.

UPSF is in the business of transporting commodities by motor carrier. Mr. Jones, who is African-American, began working for UPSF as a road driver

---

[1] Mr. Jones also raised state claims of constructive discharge, intentional infliction of emotional distress and negligence. The district court entered summary judgment in favor of UPSF on each of these claims. Mr. Jones expressly has abandoned these claims on appeal.

[2] The district court had jurisdiction under 28 U.S.C. §§ 1331, 1367(a), as well as 42 U.S.C. § 2000e-5(f)(3). We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

trainee on May 1, 2007. After one week of training, he became a road driver and drove alone on his assigned trips.

Although he lived in Birmingham, Alabama, Mr. Jones was dispatched on his trips from UPSF's terminal in Fulton, Mississippi (the "Fulton terminal"). By a contractual arrangement, the Fulton terminal is located on the grounds of Ferguson Enterprises, Inc., a wholesale plumbing distributor. Approximately twice a week, Mr. Jones would drive his UPSF truck to the Fulton terminal to pick up Ferguson's goods for transit and delivery. His visits to the Fulton terminal were generally short; his trailer would be loaded, and he would "just go in, get paperwork and leave back out."[3] The Fulton terminal was managed by Sue Miles, who also was Mr. Jones's direct supervisor. The Fulton terminal does not have an on-premises human resources department; such matters are handled generally at UPSF's headquarters in Richmond, Virginia.

Because his home was in Birmingham, Mr. Jones was permitted to park his UPSF truck during his off-duty hours at a UPSF service center, known as the Trussville terminal. The Trussville terminal, located in Leeds, Alabama, was managed by Keith Carter. It consists of a building, a parking lot for general business traffic and a yard for truck parking. The truck yard is located behind the

---

[3] R.24-2 at 11 (Jones Dep. 36).

3

building and is enclosed by a barbed-wire fence that is "pretty high."[4] Only UPSF employees are allowed inside this yard, but it is open to these employees around the clock during the work week.[5] Drivers come in and out at "all hours of the day."[6] Work is done on the dock throughout the day as well.[7]

When Mr. Jones arrived at the Trussville terminal to pick up his UPSF truck, he would park his personal vehicle in the general parking lot in front of the building and then walk to the yard behind the building, where his delivery truck was parked. He would fuel his truck at the Trussville terminal before leaving. Upon his return, he would park the truck in the yard and walk back to his car. There were no assigned parking spots in the yard; Mr. Jones would park his delivery truck wherever space was available. Mr. Jones was not required to do anything else at the Trussville terminal. Mr. Jones estimates that he was at the Trussville terminal "[m]aybe one or two days out of the week."[8]

---

[4] Id. at 34 (Jones Dep. 127). Mr. Jones "guessed" that the fence was fifty to seventy-five feet tall. Id. Carter testified that the fence was approximately eight to nine feet tall. Although the precise height of the fence is unclear from the record, both estimations support an inference that the fence was "pretty high," id., for purposes of summary judgment.

[5] R.24-9 at 5 (Carter Dep. 15).

[6] Id. (Carter Dep. 13).

[7] Id.

[8] R.24-2 at 16 (Jones Dep. 55).

## 2.

Mr. Jones first encountered what he perceived to be racial harassment during his road driver training. That week-long training was conducted by Kenneth Terrell, another UPSF driver. Terrell is Caucasian. Within the first two days of that period, while the two were on a training run, Terrell told Mr. Jones, "I know how to train you Indians."[9] When Mr. Jones responded that he was not Indian, Terrell said "I don't care what race you are, I trained your kind before."[10] Terrell used the term Indian more than once during this conversation, but made no other comments that Mr. Jones perceived to be of a racial nature. Mr. Jones testified in his deposition that Terrell's remarks were the only racially based comments made to him throughout his year-long employment at UPSF.[11]

Mr. Jones testified that he called his supervisor, Miles, during the training period to tell her that Terrell was saying "racist things."[12] Miles told Mr. Jones that she had written it down and that she would talk to the two of them when they came back to Fulton. She also asked Mr. Jones to submit a written statement of

---

[9] Id. at 43 (Jones Dep. 161); see also id. at 30 (Jones Dep. 110) ("He called me an Indian, saying I wasn't the first Indian he'd trained.").

[10] Id. at 43 (Jones Dep. 161).

[11] Id. (Jones Dep. 164).

[12] Id. at 30 (Jones Dep. 111).

5

what happened; he never did. Miles did not discuss this matter with Mr. Jones upon his return from training. Indeed, Miles testified that she did not learn of the racial nature of this incident until she was questioned about it at her deposition. She testified that she had heard from another employee that Mr. Jones "had some issues with Ken Terrell," but that Mr. Jones would not tell her what those issues were when she inquired.[13]

At some point after Mr. Jones's training period ended, he began to find remnants of bananas, such as banana peels and bananas that had been broken in half, on his delivery truck in the yard at the Trussville terminal. The bananas were always located in one of two places: either on the back of the truck's flat-bed trailer or on the steps up into the cab. Mr. Jones never saw bananas on any other truck, nor is there any evidence that he found other refuse on his truck. Mr. Jones testified that "[t]he first time [he] thought nothing of it, [he] said, [']well, maybe it was the yardmen just walking around, and maybe they forgot it, and they put it on there.[']"[14] He therefore did not report finding the bananas immediately.

On or about April 21, 2008, after finding the bananas for approximately the third time, Mr. Jones called Miles to inform her. Miles instructed Mr. Jones to

---

[13] R.28-5 at 9-10 (Miles Dep. 29-32).

[14] R.24-2 at 31 (Jones Dep. 115).

speak with Carter, the manager of the Trussville terminal, about the matter. Miles also emailed Kevin Martin, the Human Resources Manager for the UPSF Truckload Division, about the complaint.[15]

As Miles had directed, Mr. Jones went into the terminal and told Carter, whom he had not met previously, that he had been finding banana peels on his truck and that he believed that this was racially discriminatory. Carter explained that UPSF policy prohibited discrimination based on race. Carter also indicated that he did not believe anyone working at the Trussville terminal was racist. He suggested that children might be throwing the bananas over the fence. Mr. Jones responded that he did not believe that the bananas could have been thrown over the fence by children because he always found them in the same places on his truck. Carter then recommended that Mr. Jones park his trailer in a different part of the lot and that "if it comes up on there, then, we'll see."[16]

During his conversation with Carter about the banana peels, Mr. Jones said that it "seems like [there is] a lot of racism up here because the guys are wearing

---

[15] Mr. Jones relies on one sentence of Miles's email--"He said they make racial remarks to him all the time"--to establish that racially based comments were commonplace at the Trussville terminal. See Appellant's Br. 4 (citing R.28-1 at 2). For the reasons discussed infra at pp. 15-24, we cannot consider this statement in opposition to UPSF's motion for summary judgment.

[16] R.24-2 at 34 (Jones Dep. 126).

confederate shirts and confederate hats also."[17]  Carter said "that happened a while

back" and that he had "told them that they couldn't wear that type of stuff around

here."[18]  Carter was surprised to learn that Mr. Jones had observed "[p]robably

three" yardmen wearing such clothing that same day.[19]  Carter has no recollection

of Mr. Jones ever mentioning that employees were wearing Confederate flags, and

there is no evidence that he ever investigated the accusation.  Regardless, after his

conversation with Carter, Mr. Jones never witnessed any other employees at the

Trussville terminal wearing garments adorned with the Confederate flag.[20]

After his discussion with Mr. Jones, Carter did ask Tim Jacks, another

supervisor, "if he had noticed anything, anybody over in that area or anything like

that."[21]  Carter explained that this was the extent of his investigation.[22]  Carter did

not question Jimmy Shell, a "yard jockey" whom he believed to be the only person

---

[17]  Id. at 33 (Jones Dep. 121).

[18]  Id. (Jones Dep. 121, 123).

[19]  Id. (Jones Dep. 122).

[20]  Id. at 50 (Jones Dep. 192).  Mr. Jones did testify that the Confederate flag was flying at the Fulton terminal during his entire tenure with UPSF.  Other evidence in the record establishes that this was the Mississippi state flag, which incorporates the Confederate battle flag.  On appeal, Mr. Jones does not contend that the flag outside the Fulton terminal has any bearing on his claim.  We therefore consider any argument premised on this flag to be abandoned.

[21]  R.24-9 at 35 (Carter Dep. 134).

[22]  Id. (Carter Dep. 136).

with access to the yard during the relevant time periods.[23]  Nor did he question anyone else about Mr. Jones's allegations.

Less than a week after Mr. Jones reported the banana peels to Carter, an incident occurred with two workers in the Trussville terminal.  Mr. Jones recounted the incident in his deposition:

> [T]he guys came up to me and asked me about the -- why did I tell on them about the confederate flag and did I tell the manager that -- that they put the -- that they put the banana on it.  And I was -- and I was kind of nervous because it was like at night.  So you know, and it was like two of them.  And one had like a metal like crowbar or something in his hand.  So he was -- asked me and I was just like no, I didn't.  Because, you know, it wasn't supposed to have been -- [Carter] wasn't supposed to tell them.  So I was like no.  But I was like but if you did do that, I was like, I think that's not funny.  And he started laughing.

R.24-2 at 35 (Jones Dep. 130).  The men looked at him "in a certain way" and then walked away.[24]  These men were two of the yardmen that Mr. Jones previously had seen wearing clothing bearing the Confederate flag.

Mr. Jones testified that he called Miles the next morning, which was April 23 or 24, and told her about this interaction with the yardmen and that he was thinking about quitting.  Miles encouraged him not to resign and instructed

---

[23]  Id. at 11, 35 (Carter Dep. 39, 136).

[24]  R.24-2 at 36 (Jones Dep. 133).

9

Mr. Jones to come in to the Fulton terminal "so she can call the manager out of Virginia."[25]

Miles testified that Mr. Jones never told her about the encounter in the Trussville yard, and she had no recollection of hearing about this event during Mr. Jones's employment. She testified that the purpose of the conference call was to address Mr. Jones's complaints about the bananas. Both Miles and Mr. Jones agree that Miles told Mr. Jones to come to the Fulton terminal for a conference call with someone at UPSF's corporate office and that Mr. Jones went to the Fulton terminal and participated in a call with Miles and Martin.

The parties' recollections of what occurred during this call are vague. Miles remembers only that she and Martin asked Mr. Jones to provide a written statement of what had occurred. Martin recalls only that Mr. Jones gave no specifics during this call and that they asked him to provide a written statement "to get more detail."[26] He agrees with Miles that the purpose of this call was to

---

[25] Id. at 36 (Jones Dep. 134). The parties' briefs differed on this chronology. Mr. Jones's brief indicated that the conference call took place on April 23 or 24, and that the interaction with the yardmen occurred thereafter. See Appellant's Br. 8-9, 29. UPSF placed the interaction before the conference call, referencing Mr. Jones's own testimony. See Appellee's Br. 12. At oral argument, Mr. Jones's counsel indicated some uncertainty as to the order of events. We ordered the parties to submit updated chronologies, which they have done. They now agree that the conference call occurred after Mr. Jones informed Miles of the interaction.

[26] R.24-8 at 12 (Martin Dep. 43).

discuss the banana remnants on Mr. Jones's truck. Mr. Jones remembers the call, but he does not remember being asked to submit a written statement about these incidents. He does recall that Miles relayed his complaints about the bananas and the Confederate flags to Martin, but there is no indication that the interaction with the yardmen was discussed during this call. Mr. Jones remembers Martin concluding the call by saying that "he was out of town for some business," that he would "fly back in in two days[] [and] . . . start investigating on it ASAP," and that "he would stay in touch with [Mr. Jones]."[27]

Mr. Jones found bananas on his truck once after this conference call. Miles emailed Martin to inform him of this incident on April 28, 2008,[28] which suggests that Mr. Jones found the bananas on that date. In another email later that same day, Miles informed Martin that Mr. Jones had given his two-week notice.[29] Mr. Jones testified that he did not resign on the date of this last complaint[30] and

---

[27] See R.24-2 at 37 (Jones Dep. 139).

[28] R.28-3 at 4.

[29] Id. at 3.

[30] R.24-2 at 44 (Jones Dep. 167). The date on which Mr. Jones resigned is not apparent from the record. However, in their post-argument submissions, the parties agree that Mr. Jones's last day was sometime in May 2008.

11

that he worked the entire two weeks of his notice period.[31]  Miles, however, testified that Mr. Jones stopped reporting to work shortly after he tendered his resignation.[32]

## B.  District Court Proceedings

Mr. Jones filed this action against UPSF in which he alleged that he was subjected to a racially hostile work environment in violation of 42 U.S.C. § 1981 and of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.  Mr. Jones also included several state law claims in his complaint.  Following discovery, UPSF moved for summary judgment on all counts.

The district court entered judgment in favor of UPSF.  It concluded that the appearance of the bananas on Mr. Jones's truck was not racially motivated.  It then concluded that, even if Mr. Jones subjectively perceived the bananas, the Confederate flag clothing and the incident with the yardmen as sufficiently severe or pervasive to change the terms and conditions of his employment, such a view was not objectively reasonable.  Accordingly, it granted UPSF's motion for summary judgment.

---

[31]  Id. at 50 (Jones. Dep. 191).

[32]  See R.28-5 at 17 (Miles Dep. 60).

## II

## DISCUSSION

### A.  Standard of Review

We review an entry of summary judgment de novo, construing all facts and drawing all reasonable inferences in favor of the nonmoving party.  Craig v. Floyd Cnty., Georgia, 643 F.3d 1306, 1309 (11th Cir. 2011).  We "may not weigh conflicting evidence or make credibility determinations of [our] own.  If the record presents disputed issues of fact, the court may not decide them; rather, [we] must deny the motion and proceed to trial."  FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (citation omitted).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion[] and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ. P. 56(c) (1985)).[33]

---

[33]  Although the wording of Rule 56 has been amended, the standard remains the same. See Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); Fed. R. Civ. P. 56 advisory committee's note for 2010 amendments ("The standard for granting summary judgment remains unchanged.").

The burden then "shifts to the non-moving party to rebut that showing by producing affidavits or other relevant and admissible evidence beyond the pleadings." Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1315 (11th Cir. 2011). The nonmoving party does not "satisfy its burden if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511 (1986)). Instead, "the plain language of Rule 56[] mandates the entry of summary judgment[] . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S. Ct. at 2552.

## B. Hostile Work Environment Claim

"[W]hen the workplace is permeated with [racially] discriminatory intimidation, ridicule, and insult[] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116, 122 S. Ct. 2061, 2074 (2002) (internal quotation marks omitted). The same is true under § 1981. Edwards v. Prime, Inc., 602 F.3d 1276, 1300 (11th

14

Cir. 2010). An employer is therefore liable to an employee for a racially hostile

work environment under both statutes if the employee proves that:

> (1) he belongs to a protected group; (2) he was subjected to
> unwelcome harassment; (3) the harassment was based on his
> membership in the protected group; (4) it was severe or pervasive
> enough to alter the terms and conditions of employment and create a
> hostile or abusive working environment; and (5) the employer is
> responsible for that environment under a theory of either vicarious or
> direct liability.

Id.

Before this court, Mr. Jones premises his hostile work environment claim on

the following actions:

> repeated placing of banana peels . . . on his truck and not on
> Caucasian drivers' trucks; working around employees wearing
> confederate shirts on several occasions; racial comments made by
> Terrell to [Mr. Jones] directly; workers in the yard making racial
> statements in [Mr.] Jones's presence; being threatened by Caucasian
> employees after complaining about the racially hostile environment.

Appellant's Br. 24-25.

**1.**

Before turning to the merits of Mr. Jones's claim, we must address, as a

threshold matter, an evidentiary question that impacts substantially our assessment

of that claim. As we have noted earlier, Mr. Jones himself testified that the only

15

time any racial comments had been made in his presence was when Terrell did so early in his year-long employment. At oral argument, we inquired of Mr. Jones's counsel whether there is any evidence in the summary judgment record indicating that other workers made racial statements to Mr. Jones. Counsel invited our attention to an email in which Miles informed Martin that Mr. Jones "said they make racial remarks to him all the time."[34] As we observed at oral argument, however, this statement is hearsay to the extent it is used to prove the truth of the matter asserted--i.e., that "they make racial remarks to him all the time." See Fed. R. Evid. 801. As a result, the statement could not be used for that purpose at trial. See Fed. R. Evid. 802; see also Fed. R. Evid. 105.[35] We must therefore decide

---

[34] R.28-1 at 2. The relevant portion of Miles's email states:

When he comes back to the yard to [pick up] his trk/trl he finds banana peels on it. He said they make racial remarks to him all the time. I asked him to write a statement of just what they have said to him, when etc. He will be back to Fulton on Wed 4/23, I would like to have a conference call with you or Richard and Regi. He is seriously considering quitting his job over this because he fears for his safety. He says it doesn't happen anywhere but [the Trussville terminal]. . . . I have reassured him we will not tolerate this behavior from anyone, that we have a Zero tolerance [policy] to any type of harassment.

Id. at 2 (abbreviations in original).

[35] At oral argument, Mr. Jones's counsel did not assert that the statement falls within any of the exceptions to the hearsay rule. The closest Mr. Jones's counsel came to articulating a basis for this statement's admissibility was by referring to UPSF's alleged failure to take prompt remedial action. Counsel may have been suggesting that this statement would be admissible for the limited purpose of showing that UPSF was aware that Mr. Jones had complained about race-related incidents. See United States v. Hawkins, 905 F.2d 1489, 1495 (11th Cir. 1990)

(continued...)

16

whether the statement's inadmissibility at trial prevents Mr. Jones from relying upon it to defeat UPSF's summary judgment motion.

**a.**

"The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." Macuba v. DeBoer, 193 F.3d 1316, 1322 (11th Cir. 1999) (footnote omitted) (internal quotation marks omitted). Nevertheless, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." Id. at 1323 (internal quotation marks omitted).

The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial. See Pritchard v. S. Co. Servs., 92 F.3d 1130, 1135 (11th Cir. 1996) (noting that an

---

[35](...continued)
(holding that testimony about complaints received by an investigator could be used to demonstrate that the investigator had a basis for an investigation, but not for establishing that there was any truth to the content of the complaints). Even if the evidence were admissible for that purpose, however, the trier of fact could not consider the statement as evidence that the racial remarks were in fact made. Cf. Fed. R. Evid. 105 ("If the court admits evidence that is admissible against a party or for a purpose--but not against another party or for another purpose--the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly.").

affidavit "can be reduced to admissible form at trial" by calling the affiant as a witness). If, however, the declarant has given sworn testimony during the course of discovery that contradicts the hearsay statement, we may not consider the hearsay statement at the summary judgment phase. The possibility that the declarant might change his sworn deposition testimony and admit to the truth of the hearsay statement amounts only to "a suggestion that admissible evidence might be found in the future," which "is not enough to defeat a motion for summary judgment." McMillian v. Johnson, 88 F.3d 1573, 1584 (11th Cir. 1996). When asked at his deposition whether "anyone else," other than Terrell, "made racial comments to [him]," Mr. Jones answered, "No."[36] Accordingly, we cannot

---

[36] R.24-2 at 43 (Jones Dep. 164). After testifying about the comments made by Terrell, Mr. Jones was asked:

> Q.    Is there anyone else at UPS that you contend made race related comments to you at any time during your employment?
>
> A.    That's all except the people that I told you about before.
>
> Q.    Well, you told me about Mr. Terrell?
>
> A.    Uh-huh.
>
> Q.    Is there anyone else that you contend made racial comments to you?
>
> [Objection, Question Renewed]
>
> A.    No.

R.24-2 at 43 (Jones Dep. 164).

(continued...)

18

assume that Mr. Jones will change his testimony at trial and testify in conformity with the hearsay statement.

Mr. Jones also might attempt to prove that such statements were made by putting on testimony of witnesses who have personal knowledge of the alleged racial statements. The record, however, contains no indication of any "witness with personal knowledge who will testify [to this] at trial." Id. at 1584. The possibility that unknown witnesses will emerge to provide testimony on this point is insufficient to establish that the hearsay statement could be reduced to admissible evidence at trial. See Pritchard, 92 F.3d at 1135 ("There is nothing to indicate that Pritchard's statements (which were based on the statements of unknown co-workers) will lead to admissible evidence."). This is particularly true when the hearsay statement is rebutted by evidence that can be reduced to admissible form, such as deposition or affidavit testimony. See id. Here, Mr. Jones himself testified that the only time any racial comments were made in his presence was that one occasion when Terrell did so early in his year-long employment.

---

[36](...continued)
Mr. Jones's comments, read as a whole, appear to incorporate by reference his earlier testimony about the incidents at the Trussville facility. Nowhere in that testimony does he mention any race-related comments.

19

It would appear, then, that the hearsay statement in Miles's email--that

Mr. Jones had heard others making racially derogatory remarks to him--could not

be presented at trial in admissible form and therefore cannot be considered in an

effort to defeat summary judgment.[37]

---

[37] There is one further complication to this analysis: UPSF did not object to these statements as hearsay until its post-argument submissions to this court. In Offshore Aviation v. Transcon Lines, Inc., we stated that "if evidence otherwise inadmissible provoked no timely objection, it could and, if material, should be factored into a summary judgment decision." 831 F.2d 1013, 1016 (11th Cir. 1987) (per curiam). However the context and subsequent interpretation of our statement from Offshore Aviation make it clear that this statement should not be read to require our consideration of the statement in Miles's email.

In Offshore Aviation, a purchaser of goods brought an action against a carrier for damages that occurred to the goods while in the custody of the carrier. Id. at 1014. A central issue in the case was the condition of the goods at the time they were delivered to the carrier. The district court had entered summary judgment in favor of the purchaser. We reversed, concluding that there was a genuine issue of material fact as to the condition of the goods upon shipment. Id. at 1016. In doing so, we relied upon a letter from an employee of the seller of the goods indicating that the goods were "'in an unserviceable state.'" Id. at 1015. Although the letter was hearsay, we explained that "two factors require[d] that the letter be included in an assessment of the facts." Id. The first was that the inadmissibility of the letter "does not undercut the existence of any material facts the letter may put into question." Id. We have since explained that

> [t]here was no indication in Offshore Aviation that the letter could not be reduced to admissible evidence at trial. Indeed, that the letter at issue was based on the writer's personal knowledge indicates that there was no impediment to the writer testifying at trial as to the facts described in the letter.

McMillian v. Johnson, 88 F.3d 1573, 1585 (11th Cir. 1996) (citation omitted). In the case now before us, by contrast, Mr. Jones's testimony that Terrell was the only person who made racial statements to him and the absence of other witnesses who could testify to these statements are impediments to the evidence being presented to a jury.

The second "factor[]" that led us to consider the hearsay evidence at the summary judgment stage in Offshore Aviation was the moving party's failure to contest the admissibility of the letter during the district court proceedings. 831 F.2d at 1015-16. We since have emphasized that "Offshore Aviation [did not] hold that inadmissible hearsay may be used even when it cannot be reduced to admissible evidence at trial." McMillian, 88 F.3d at 1585. Indeed,

(continued...)

20

**b.**

There is another and, perhaps, more fundamental reason why the statement

in Miles's email should not be considered in deciding summary judgment.  In

Evans v. Stephens, 407 F.3d 1272 (11th Cir. 2005) (en banc), we held that we

should not consider for summary judgment purposes even non-hearsay testimony

of a witness that is more favorable on a factual issue than the nonmoving party's

own testimony.  On that occasion we explained that

> we accept the nonmovant's version of the events when reviewing a
> decision on summary judgment.  When the nonmovant has testified to
> events, we do not (as urged by Plaintiffs' counsel) pick and choose
> bits from other witnesses' essentially incompatible accounts (in
> effect, declining to credit some of the nonmovant's own testimony)
> and then string together those portions of the record to form the story
> that we deem most helpful to the nonmovant.  Instead, when conflicts
> arise between the facts evidenced by the parties, we credit the
> nonmoving party's version.  Our duty to read the record in the
> nonmovant's favor stops short of not crediting the nonmovant's
> testimony in whole or part:  the courts owe a nonmovant no duty to
> disbelieve his sworn testimony which he chooses to submit for use in
> the case to be decided.

---

[37](...continued)
our statement in Offshore Aviation was premised upon the letter being "the only statement in the record that approaches personal knowledge of the condition of the shipment."  831 F.2d at 1016 (internal quotation marks omitted); accord McMillian, 88 F.3d at 1585.  Therefore, the first factor in Offshore Aviation--i.e., whether the statement could be reduced to admissible form at trial--is a necessary condition to our consideration of hearsay evidence at summary judgment.  If it were not, we might well require that a trial be conducted based on evidence that the trier of fact never would hear.  Such an approach would be a substantial waste of judicial resources.  As a result, we do not consider this hearsay statement at this stage.  See McMillian, 88 F.3d at 1585.

21

Id. at 1278 (footnote omitted) (citing Draper v. Reynolds, 369 F.3d 1270, 1272 (11th Cir. 2004); Rowe v. Ft. Lauderdale, 279 F.3d 1271, 1279 n.9 (11th Cir. 2002)).[38]

In sum, the statement in Miles's email that Mr. Jones reported that others were making racially derogatory remarks to him is not reducible to an admissible form and is contrary to Mr. Jones's own deposition testimony. It therefore cannot be considered in opposition to UPSF's motion for summary judgment.[39]

---

[38] The concurring opinion explained the reason for this rule:

> The good reason is that, absent some extraordinary circumstance, no reasonable jury would believe that a party was lying when he said something harmful to his own case. Reasonable juries know that is not how human nature, influenced by self-interest, works. And when we decide whether summary judgment is warranted, we view the evidence in the non-movant's favor, but only to the extent that it would be reasonable for a jury to resolve the factual issues that way. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986) (to defeat summary judgment "there must be evidence on which the jury could reasonably find for the plaintiff"); Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999) ("[T]here must be sufficient evidence on which the jury could reasonably find for the plaintiff ...."); id. ("The nonmovant need not be given the benefit of every inference but only of every reasonable inference." (language from the district court's order, attached as Appendix A and adopted by the Court)); Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988) ("The summary judgment standard requires that we resolve all reasonable doubts in favor of the non-moving party, but it does not require us to resolve all doubts in such a manner." (quotation and ellipsis omitted)).

Evans v. Stephens, 407 F.3d 1272, 1284 (11th Cir. 2004) (en banc) (Carnes, J., concurring, joined by Dubina and Hull, JJ.).

[39] These considerations, however, would not preclude our consideration of Miles's explanation of her statement in the email. When, during her deposition, Miles was questioned about the contents of the email, she responded accordingly:

(continued...)

22

**2.**

UPSF urges that, in addition to Miles's email, there is other evidence offered by Mr. Jones in opposition to summary judgment that we must disregard. Specifically, UPSF asserts that the banana incidents were not racially motivated and, therefore, cannot be considered by this court in determining whether Mr. Jones experienced a racially hostile work environment.[40]

---

[39](...continued)

Q. Okay. And then the next sentence is, "He said they make racial remarks to him all the time." A moment ago when I was asking you about this conversation, you didn't tell me about that. Does that refresh your recollection about your conversation?

A. Yes, it does.

Q. Okay. Do you remember what he said about that?

A. He says they stand on the dock and laugh at him. . . . And he felt that was a racial remark, that they were laughing at him.

Q. Okay. Did he say that they actually said any words or just laughing?

A. Just laughing.

R.28-5 at 12 (Miles Dep. 40-41). During the course of his deposition, Mr. Jones did not offer any testimony to contradict Miles's qualification of the statement in the email--that workers on the dock laughed at Mr. Jones and that he interpreted this laughter to be based on his race. This statement, therefore, might be reducible to an admissible form.

Nevertheless, neither before the district court nor in this court did Mr. Jones argue that the laughter of coworkers contributed to a hostile work environment. Moreover, the record reveals no context for the laughter mentioned by Miles. Mr. Jones mentioned that one of the yardmen who approached him in the parking area of the Trussville terminal laughed at him, and we have taken into consideration this encounter in our hostile work environment analysis.

[40] UPSF does not make such an argument with respect to the other incidents of alleged

(continued...)

23

It is a "bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII." Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 809 (11th Cir. 2010) (en banc). Therefore, only conduct that is "based on" a protected category, such as race, may be considered in a hostile work environment analysis. See Gupta v. Florida Bd. of Regents, 212 F.3d 571, 584 (11th Cir. 2000), abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405 (2006). "Innocuous statements or conduct, or boorish ones that do not relate to the [race] of the actor or of the offended party (the plaintiff), are not counted." Id. at 583; see also Baldwin v. Blue Cross/Blue Shield of Ala., 480 F.3d 1287, 1301-02 (11th Cir. 2007) ("Title VII does not prohibit profanity alone, however profane. It does not prohibit harassment alone, however severe and pervasive. Instead, Title VII prohibits discrimination, including harassment that discriminates based on a protected category . . . ."). This "inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 1003 (1998).

"The use of the term 'monkey' and other similar words have been part of

[40](...continued)
harassment at issue in this case.

24

actionable racial harassment claims across the country." Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 911 (8th Cir. 2006); see also Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1269 (11th Cir. 2008) (describing "racial slurs," including the term "monkey" that were used against an African-American employee); Walker v. Thompson, 214 F.3d 615, 626 (5th Cir. 2000) (citing "comparisons to slaves and monkeys" among other harassment as sufficient to create a jury question with respect to a racially hostile work environment), abrogated on other grounds by White, 548 U.S. 53, 126 S. Ct. 2405. "Given the history of racial stereotypes against African-Americans and the prevalent one of African-Americans as animals or monkeys, it is a reasonable--perhaps even an obvious--conclusion that" the use of monkey imagery is intended as a "racial insult" where no benign explanation for the imagery appears. United States v. Jones, 159 F.3d 969, 977 (6th Cir. 1998) (addressing a selective prosecution claim); cf. Ellis v. CCA of Tenn. LLC, 650 F.3d 640, 647-48 (7th Cir. 2011) (describing contexts in which managers might use monkey imagery for legitimate workplace purposes).

Moreover, "it 'has become easier to coat various forms of discrimination with the appearance of propriety' because the threat of liability takes that which was once overt and makes it subtle." Id. at 645 (quoting Aman v. Cort Furniture

25

Rental Corp., 85 F.3d 1074, 1082 (3d Cir. 1996)). For instance, a discriminator may conjure up images of monkeys by using items associated with monkeys, such as their stereotypical food of choice, the banana. When a race claim is premised upon the presence of bananas, which requires us to infer that the person who placed the bananas was evoking a racial slur, we must, of course, be cognizant of the surrounding circumstances. People commonly eat and discard bananas, in the workplace and elsewhere, without any racial motivation. See R.24-2 at 31 (Jones Dep. 115) (explaining that he did not immediately conclude that the bananas were a racial message because "maybe it was the yardmen just walking around, and maybe they forgot"); R.24-9 at 33 (Carter Dep. 126) (indicating that children may have thrown the banana peels over the fence from a school bus stop). Unfortunately, some people do use bananas to communicate racial slurs. See Hobson v. Wilson, 737 F.2d 1, 12 (D.C. Cir. 1984) (describing a "leaflet entitled 'Give Them Bananas!,' which depicted "a crude drawing of a black monkey with a banana[] and read[] in part, 'Suck on your bananas, brother, and someday you might learn how to make a fire or build a wheel,'" as "racially-inflammatory"); Police Officers for Equal Rights v. City of Columbus, 644 F. Supp. 393, 401 (S.D. Ohio 1985) (stating that "an incident in which two white [police] officers presented [a black police officer] with a bunch of bananas" was an "egregious[]

26

example[] of bigotry" that was the white officers' "not[-]so[-]subtle way of indicating that they believed [the black officer] to be of ape ancestry"); <u>Clifton v. Massachusetts Bay Transp. Auth.</u>, 839 N.E.2d 314, 316, 445 Mass. 611, 613-14 (2003) (describing the nicknames "f[---]ing banana" and "Sanford" as evidence of "racial harassment"); Clay Calvert & Robert D. Richards, <u>Fans and the First Amendment: Cheering and Jeering in College Sports</u>, 4 Va. Sports & Ent. L. J. 1, 3 n.9 (2004) (describing how African-American basketball star Patrick Ewing had racial insults yelled at him and bananas thrown at him during his college basketball career); <u>Apology for Throwing a Banana</u>, N.Y. Times, Sept. 30, 2011, at B12 (describing a professional hockey game in which a banana was thrown at an African-American player).

We have no difficulty concluding that the record before us creates a genuine issue of triable fact on this issue. Mr. Jones found bananas on his truck on multiple occasions. Each time, the bananas were in one of two places--either on the steps up to the truck's cab or on the back of the truck's flat bed--even though Mr. Jones parked his UPSF truck in a different location each night. There is no evidence that bananas were found on any other truck. Nor is there any evidence that Mr. Jones found any other refuse on his truck. This combination of facts suggests the bananas were not appearing on Mr. Jones's truck by mere chance.

27

When viewed in its totality, this evidence would allow a rational trier of fact to conclude that someone was placing the bananas on Mr. Jones's truck to send a message of racial intolerance.

UPSF nevertheless argues that "it is at least just as likely that the presence of banana pieces or peels had nothing whatsoever to do with Jones, as an individual, or his race." Appellee's Br. 19. UPSF is free to make this argument to a trier of fact. However, on review of UPSF's summary judgment motion, we "review all evidence <u>and inferences reasonably drawn from the evidence</u> in the light most favorable to the nonmoving party," here Mr. Jones. <u>Perry v. Sec'y, Florida Dep't of Corr.</u>, 664 F.3d 1359, 1363 (11th Cir. 2011) (emphasis added). As we just have explained, the adjudicative facts of the record are also susceptible to a very different characterization. Consequently, we shall consider the placement of the banana peels on the truck as racially motivated for purposes of assessing whether Mr. Jones has come forward with sufficient evidence of a hostile work environment to reach a jury.

**3.**

**a.**

We now must determine whether a reasonable trier of fact could conclude that Mr. Jones's "workplace [wa]s permeated with discriminatory intimidation, ridicule, and insult that [wa]s sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993) (citation omitted) (internal quotation marks omitted). "In evaluating allegedly discriminatory conduct, we consider its 'frequency . . .; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Reeves, 594 F.3d at 808-09 (alteration in original) (quoting Harris, 510 U.S. at 23, 114 S. Ct. at 371). Any relevant factor must be taken into account, but no single factor is dispositive. See Harris, 510 U.S. at 23, 114 S. Ct. at 371.

"The determination of whether race-based harassment was so severe or pervasive as to alter the conditions of employment includes both subjective and objective components." EEOC v. Xerxes Corp., 639 F.3d 658, 676 (4th Cir. 2011) (internal quotation marks omitted); accord Reeves, 594 F.3d at 809. The burden is on the plaintiff to demonstrate that he perceived, and that a reasonable person would perceive, the working environment to be hostile or abusive. See Reeves, 594 F.3d at 809.

29

As the case comes to us, we must accept, in reviewing the grant of summary judgment, that Mr. Jones subjectively perceived that the harassment rose to this level. Our present focus, therefore, must be on whether a trier of fact could determine that the facts of record constitute severe or pervasive harassment from "the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Id. (internal quotation marks omitted).

**b.**

Turning to Mr. Jones's specific allegations, the first relevant incident is the conversation during Mr. Jones's first week of employment with UPSF, in which his instructor, Terrell, referred to Mr. Jones as an Indian. When Mr. Jones informed Terrell that he was not an Indian, Terrell replied: "I don't care what race you are, I trained your kind before."[41] Mr. Jones is neither Native American nor Indian. Nevertheless, a harasser's use of epithets associated with a different ethnic or racial minority than the plaintiff will not necessarily shield an employer from liability for a hostile work environment. See EEOC v. WC&M Enters., Inc., 496 F.3d 393, 401 (5th Cir. 2007) (stating that, in the context of national origin discrimination, "a party is able to establish a discrimination claim based on [his]

---

[41] R.24-2 at 43 (Jones Dep. 161) (emphasis added).

own national origin even though the discriminatory acts do not identify the victim's actual country of origin" and the discrimination associates the victim with a different country based on shared physical features); LaRocca v. Precision Motorcars, Inc., 45 F. Supp. 2d 762, 770 (D. Neb. 1999) ("The fact that Ms. Friend ignorantly used the wrong derogatory ethnic remark toward the plaintiff is inconsequential. It is enough that the plaintiff's Italian characteristics were the foundation of Ms. Friend's harassment.").[42] It is possible that Terrell used the offensive term in a manner that is unrelated to Mr. Jones's race. Terrell, however, could have been directing a slur at Mr. Jones based on his dark complection or some other perceived shared characteristic with Native Americans.[43] Thus, for the purposes of summary judgment, we must consider this statement as a racial slur. By itself, this incident would not constitute the sort of harassment that is actionable under the statute. Nevertheless, although removed significantly in both place and circumstance from the remainder of the harassing behavior, a reasonable trier of fact could take it into account in determining whether Mr. Jones endured a

---

[42] See also EEOC Compliance Manual § 15-II (2006) ("Title VII's prohibition of race discrimination generally encompasses: . . . . Employment discrimination against an individual based on a belief that the individual is a member of a particular racial group, regardless of how the individual identifies himself. Discrimination against an individual based on a perception of his or her race violates Title VII even if that perception is wrong.").

[43] Indeed, UPSF has refrained from arguing that Terrell's statements were not based on Mr. Jones's race.

31

hostile work environment.

Mr. Jones next invites our attention to four occasions on which he found banana peels on his delivery truck in the Trussville yard. The record is not clear with respect to when the bananas first appeared on Mr. Jones's truck; at his deposition, he first testified that he did not remember when the first banana peel was found, but then pegged the first incident to be near the beginning of his employment.[44] It is important to note, however, that reading the record in the light most favorable to Mr. Jones, at least two of those incidents occurred within the last few weeks of his employment. A reasonable juror certainly could determine that, once these instances became repetitive and escalated in frequency, they were hardly benign and amounted to racially harassing behavior directed to Mr. Jones. Therefore, in the present summary judgment posture of this case, we must conclude that, although Mr. Jones heard only one racial epithet uttered during his employment, he was subjected to a series of other communicative actions of a racial nature aimed directly at him and increasing in frequency.

Shortly after Mr. Jones discovered banana peels on his truck for the third time, he also witnessed individuals at the Trussville terminal wearing shirts or hats bearing Confederate flags. See Ellis, 650 F.3d at 648 (citing Watson v. CEVA

---

[44] R.24-2 at 31 (Jones Dep. 113-16).

32

Logistics U.S., Inc., 619 F.3d 936, 938-39 & n.2 (8th Cir. 2010)) ("[W]e agree that displays of confederate flags in the workplace may support a hostile work environment claim."); Hedgeman v. Austal, U.S.A., LLC, No. 08-00155-KD-N, --- F. Supp. 2d ----, 2011 WL 2036968, at *8 (S.D. Ala. May 24, 2011) (listing "images of the Confederate flag" among evidence that created a jury question on the issue of a hostile work environment).[45]  Specifically, the day he voiced his concern over the banana incidents to Carter, he had encountered "[p]robably three" individuals wearing such apparel.[46]

Finally, Mr. Jones points to his encounter with the yardmen. Less than a

---

[45] UPSF has not disputed that the display of Confederate flags can support a hostile work environment claim.

[46] R.24-2 at 33 (Jones Dep. 122).  The record does not support Mr. Jones's assertion in his brief that he "work[ed] around employees wearing confederate shirts on several occasions." Appellant's Br. 24.  Mr. Jones states in his deposition that he reported to Carter that he had seen individuals wearing Confederate shirts and hats.  According to Mr. Jones:  "Then [Carter] said about the shirts and stuff, he said he –– that happened a while back, so he was -- he kind of told on himself about some more incidents that must have happened because I wasn't even talking about a while back.  I was talking about that day." R.24-2 at 33 (Jones Dep. 121) (emphasis added).  At his deposition, Carter testified that he had in fact observed employees wearing clothing bearing the Confederate flag a few years before Mr. Jones's period of employment with UPSF and that he asked the employees wearing such clothing to turn their shirts inside out because the flag is offensive to some African Americans.  R.24-9 at 40 (Carter Dep. 154-55).  Mr. Jones appears to assume that these previous occasions of employees wearing Confederate shirts and hats occurred during his year of employment.  However, such assumptions are not admissible and may not be considered on summary judgment.  See, e.g., Livick v. Gillette Co., 524 F.3d 24, 28 (1st Cir. 2008) ("Under Rule 56[], an affidavit at the summary judgment stage must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.  This requisite personal knowledge must concern facts as opposed to conclusions, assumptions, or surmise." (citation omitted) (internal quotation marks omitted)).

33

week after Mr. Jones brought the issue of the bananas to Carter's attention, Mr. Jones returned to the Trussville terminal, parked his truck and began walking to his personal vehicle. Two yardmen approached Mr. Jones, one of whom was carrying a crowbar or other metal tool. Mr. Jones had seen each of the men wearing a Confederate hat or shirt on the day that he had spoken to Carter. One of the two asked if Mr. Jones had reported them. Mr. Jones responded that he had not, but that he did not think the behavior was funny. The yardman with the metal object laughed, and they "look[ed] at [Mr. Jones] in a certain way."[47] Mr. Jones then walked away.

The Supreme Court has cautioned that, in evaluating whether a working environment is hostile, it is necessary to consider carefully "the social context in which particular behavior occurs and is experienced." Oncale, 523 U.S. at 81, 118 S. Ct. at 1003. Here, however, consideration of "the social context" can lead to very different assessments of the situation that Mr. Jones faced. On one hand, the encounter took place in a twenty-four hour truck yard. The undisputed testimony is that there are employees present, both drivers and yardmen, throughout the day and night. A jury might consider this factor as mitigating the degree of intimidation that would be experienced by someone in Mr. Jones's situation.

---

[47] R.24-2 at 36 (Jones Dep. 133).

Moreover, it would not be unusual for yardmen to have in their possession tools used for the loading and maintenance of vehicles. There is no evidence in the record that the yardman involved in the confrontation did anything with the object other than hold it at his side. There are other aspects of the encounter, as well, that, in the view of the jury, might diminish its seriousness. The encounter was brief.[48] The yardmen did not, in language or gesture, threaten overtly Mr. Jones. Furthermore, after he had told the yardmen he did not think the actions were funny, Mr. Jones simply walked away; the yardmen did not try to continue the conversation, to follow him or to prevent him from going to his vehicle.

On the other hand, a reasonable juror also might conclude that, from an objective point of view, the confrontation was intimidating to an African-American employee. The encounter took place at night. Prior to the confrontation, at around the same time that the bananas began appearing with increased regularity, Mr. Jones had seen both of the individuals involved in the confrontation wearing Confederate clothing. Therefore, one could infer that these two men harbored racial animosity towards him. Furthermore, one could interpret

---

[48] Cf. Coolidge v. Consol. City of Indianapolis, 505 F.3d 731, 734 (7th Cir. 2007) (considering brevity of incident in determining whether exposure to pornography created a hostile work environment); Brooks v. City of San Mateo, 229 F.3d 917, 926 (9th Cir. 2000) (citing brevity of incident as mitigating against a determination that a single incident could create a hostile work environment).

the confrontation as accusatory. Most importantly, one of the workers was carrying what could be perceived as a weapon. Finally, while brief, the encounter ended in a less-than-conciliatory tone. Although Mr. Jones was present at the Fulton terminal for only a short part of his work week, we do not believe a jury should be precluded from considering events that occurred there in assessing Mr. Jones's hostile work environment claim. Mr. Jones was an over-the-road truck driver. He spent the greater part of his working hours alone in the cab of his truck on the open road. His stops at the Fulton terminal were short. His time at the Trussville facility, while brief, was a significant part of the time that he spent with other UPSF personnel. It was the location where he left his truck when it was not in use. The trier of fact could infer from the description of the facility in the record that the confronting workers apparently had free access to Mr. Jones's truck at the times when it was parked in the yard, but he was absent. To an over-the-road truck driver like Mr. Jones, the safety and readiness of his vehicle would be a matter of central and continuing concern.

**c.**

In evaluating whether Mr. Jones has raised a jury question with respect to a hostile work environment, we must consider the totality of circumstances, keeping

in mind that "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." Oncale, 523 U.S. at 81-82, 118 S. Ct. at 1003.

In the present case, a reasonable juror might take the view that the evidence does not paint a picture of a work environment "permeated with discriminatory intimidation, ridicule, and insult." Harris, 510 U.S. at 21, 114 S. Ct. at 370 (internal quotation marks omitted). The juror might reason that, over the course of his year's employment, Mr. Jones experienced a total of seven instances of racially based harassment. Of those, one--being called Indian--was, at best, indirectly related to Mr. Jones's race; another--the first banana incident--did not bother Mr. Jones; and a third--workers at Trussville wearing Confederate apparel--was not directed specifically at Mr. Jones. Even the most serious allegation, the encounter with the yardmen, did not include any overt reference to Mr. Jones's race, nor did it involve any direct physical threat.

Nevertheless, a reasonable juror also would be justified in taking a contrary view of the evidence. A juror could conclude that the harassment, sporadic at first, escalated in frequency and in seriousness to the point that it created a hostile work environment. Specifically, during the month of April, Mr. Jones found

bananas on his truck for the third and fourth time--actions that an African American certainly could find racist and demeaning. Cf., e.g., Green, 459 F.3d at 911 (recounting that an African-American employee "thought the term 'monkey' was roughly equivalent to 'N[----]r'"). While at the Trussville terminal to speak to Carter, Mr. Jones witnessed three employees wearing Confederate shirts or hats, all on the same day; as one of our sister circuits has observed, "it is not an irrational inference that one who displays the confederate flag may harbor racial bias against African-Americans." United States v. Blanding, 250 F.3d 858, 861 (4th Cir. 2001) (emphasis omitted). Moreover, a reasonable jury could also conclude that it was no coincidence that three employees happened to come to work wearing clothing bearing the Confederate flag on the same day and around the same time that the bananas began to appear on Mr. Jones's truck with greater frequency. Within a week of his meeting with Carter, Mr. Jones was confronted by two yardmen about that meeting; the yardmen approached Mr. Jones at night, and one of them held an object that could be perceived as a weapon. Notably, the yardmen were among those Mr. Jones had seen wearing Confederate-decorated attire. This could be perceived as "physically threatening," an important factor in our hostile work environment analysis. See, e.g., Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1276 (11th Cir. 2002). Moreover, shortly after this

38

encounter, Mr. Jones again found bananas on his truck. Incidents of harassment "'that continue despite the employee's . . . objections are indicative of a hostile work environment.'" Miller, 277 F.3d at 1276 (quoting Shanoff v. Illinois Dep't of Human Servs., 258 F.3d 696, 704 (7th Cir. 2001)).

Indeed, we believe that Mr. Jones has presented a situation similar to that in Green v. Franklin National Bank of Minneapolis, 459 F.3d 903 (8th Cir. 2006). In Green, the Eighth Circuit concluded that eight instances of a coworker's use of racial epithets in a three-month period of time, including calling the plaintiff a "monkey" and a "chimpanzee," id. at 907, combined with physically threatening references and statements that he would "get even" with people who wronged him, were sufficiently severe and pervasive to be actionable. Id. at 911-12.[49] Here, there were seven incidents of racist acts over a year, four of which--the last two banana incidents, the Confederate clothing and what reasonably could be perceived as a threatening confrontation--occurred within a two-week period of time near the end of Mr. Jones's employment with UPSF. It is this escalation of incidents, with a possibly threatening confrontation as its centerpiece, that makes

---

[49] Although the incidents of harassment in Green were greater in number than in the present case and were directed personally at the plaintiff, we are mindful that "appalling conduct alleged in prior cases" does not "mark the boundary of what is actionable." Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir. 2000) (quotation marks omitted).

the issue of racial harassment, as that term is used in the statute, one for the trier of fact. Consequently, we believe that the increasing frequency and seriousness of the harassment experienced by Mr. Jones presents a jury question on the issue of whether he endured a hostile work environment.

## 4.

Although UPSF also moved for summary judgment on the ground that it took prompt remedial action, the district court did not address this aspect of the case. We shall not address this issue in the first instance, but leave it for the district court to address on remand.

## Conclusion

The judgment of the district court is **vacated** and the case is remanded for further proceedings consistent with this opinion.

**VACATED AND REMANDED.**