Elizabeth MWANGI, Plaintiff,

v.

FEDERAL NATIONAL MORTGAGE ASSOCIATION, Whitman Associates, Inc., d/b/a A Plus Realty Georgia, and Asset Management Specialists, LLC, Defendants.

CIVIL ACTION FILE NO.: 4:14–CV–0079–HLM

United States District Court, N.D. Georgia, Rome Division.

Signed February 16, 2016

See also 2016 WL 770818, 2016 WL 770820.

Alyson A. Straight, Andrew C. Evans, Evans Law, LLC, Atlanta, GA, for Plaintiff.

Frank Reid Olson, John Dale Andrle, Cobb, Olson & Andrle, LLC, David S. Klein, Ned Blumenthal, Weissman Nowack Curry & Wilco, P.C., Atlanta, GA, Burke Blackwell Johnson, Morris Schneider Wittstadt, LLC, Loganville, GA, for Defendant.

*ORDER*

HAROLD L. MURPHY, UNITED STATES DISTRICT JUDGE

This case is before the Court on the Motion for Summary Judgment filed by Defendant Whitman Associates, Inc. ("Defendant Whitman") [113].

## I. Background

### A. Factual Background

Keeping in mind that, when deciding a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the Court provides the following statement of facts. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir.2012). This statement does not represent actual findings of fact. *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 530 (11th Cir.2013). Instead, the Court has provided the statement simply to place the Court's legal analysis in the context of this particular case or controversy.

As required by the Local Rules, Defendant Whitman filed a Statement of Material Facts as to Which There Is No Genuine Issue to Be Tried ("DSMF"). (Docket Entry No. 113–5.) As also required by the Local Rules, Plaintiff filed a response to DSMF ("PRDSMF"). (Docket Entry No. 127.) As permitted by the Local Rules, Plaintiff filed her own Statement of Additional Material Facts ("PSMF"), (Docket Entry No. 126–6), to which Defendant Whitman responded ("DRPSMF") (Docket Entry No. 134).[1] The Court evaluates

---

1. In its response to PSMF, Defendant Whitman argues for the first time that the Court should not consider the depositions of Defendant Federal National Mortgage Association's ("Defendant Fannie Mae") representative or Chris Singleton ("Mr.Singleton") because Defendant Whitman was not a party to this action or present when Plaintiff took those depositions. (DRPSMF at 1–2.) Defendant Whitman argues, without citing any authority whatsoever, that "[t]he use of depositions against a later added party that was not present at the deposition is patently unfair." (*Id.* at 2.) According to Defendant Whitman, "Plaintiff had the opportunity to re-depose [those individuals] after the Court added [Defendant Whitman] as a party-defendant, but failed to do so." (*Id.*)

DSMF, PRDSMF, PSMF, and DRPSMF below.

### 1. The Property

In 2006, Plaintiff purchased property located at 101 Natalie Court, Dallas, Georgia 30157 (the "Property") with a loan (the "Loan"). (DSMF ¶ 1; PRDSMF ¶ 1.) The Loan was secured by a deed to secure debt (the "Security Deed"), which named Mortgage Electronic Registration Systems ("MERS") as the nominee and AmTrust Mortgage Corporation, including its successors and assigns ("AmTrust"), as Lender. (DSMF ¶ 1; PRDSMF ¶ 1.)

Plaintiff endured financial hardship and attempted to short-sell the Property as an alternative to foreclosure. (DSMF 2; PRDSMF 2.) Plaintiff listed the Property for sale through a Realtor, Kimani Karangu. (DSMF ¶ 3; PRDSMF ¶ 3; PSMF ¶ 1; DRPSMF ¶ 1.) In the listing for the Property, Mr. Karangu described the "Owner's Name" as "VACANT." (DSMF ¶ 4; PRDSMF ¶ 4; PSMF ¶ 2, as modified per DRPSMF 2.) According to Mr. Karangu, this description only signaled that no one was living on the Property, and did not convey that the Property was empty or abandoned. (Dep. of Kimani Karangu (Docket Entry No. 58) at 27–28, 61–62, 64.) According to Defendant Whitman, some of the listing pictures showed the Property without furniture or other items. (DSMF ¶ 5.)

In or about April 2002, Plaintiff moved out of the Property and into an apartment with her sister after experiencing health complications with a pregnancy. (DSMF ¶ 6; PRDSMF ¶ 6 (arguing DSMF ¶ 6 is immaterial); PSMF ¶ 3; DRPSMF ¶ 3; Dep. of Pl. Vol. I (Docket Entry No. 57) at 25.) Plaintiff brought with her only a bag of pregnancy clothes and some "female personal stuff." (Pl. Dep. Vol. I at 45; PSMF ¶ 4; DRPSMF ¶ 4.)

Around or soon after the time that Plaintiff moved out of the Property, she discontinued all of her utilities. (DSMF ¶ 7; PRDSMF ¶ 7.) Between June 2012 and February 2013, individuals including Mary Theresa Mwangi, Sarah Wanjira, Catherine Muriuki, Jimmy Baba, and an unknown individual had access to the Property. (DSMF ¶ 8; PRDSMF ¶ 8.) Plaintiff points out that Mr. Baba and the unknown individual only accessed the Property on one occasion, and that Ms. Wanjira and Mary Theresa Mwangi were the only individuals who had keys to the Property. (PRDSMF ¶ 8.)

After Plaintiff went to stay with her sister, Ms. Wanjira visited the Property and packed Plaintiff's items into boxes. (Dep. of Sarah Wanjira (Docket Entry No. 117) at 14, 52; PSMF ¶ 5; DRPSMF ¶ 5.) Ms. Wanjira moved the boxes into the garage and downstairs hallway so that Plaintiff could hire movers and retrieve her possessions on short notice. (Wanjira Dep. at 52; Pl. Dep. Vol. I at 68; PSMF ¶ 6; DRPSMF ¶ 6.) Ms. Wanjira testified that she last visited the Property in Janu-

---

The Court finds Defendant Whitman's argument unpersuasive. First, Defendant Whitman cites no authority to support its argument. Second, Defendant Whitman ignores the fact that, to the extent that it had any concerns about the depositions at issue, it had an opportunity during discovery to re-depose those individuals. Third, even if the testimony at issue is hearsay, the Court can consider it in connection with Defendant Whitman's summary judgment motion because Plaintiff can reduce the hearsay to admissible form at trial by calling Mr. Singleton and Defendant Fannie Mae's representatives as witnesses. *See Jones v. UPS Ground Freight, Inc.,* 683 F.3d 1283, 1293–94 (11th Cir.2012) ("[A] district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form."). The Court therefore overrules this objection.

ary 2013. (Wanjira Dep. at 14; PSMF ¶ 7; DRPSMF ¶ 7.)

On December 12, 2012, Jerry Juhl, a licensed real estate agent and property inspector, visited the Property on behalf of one of his clients interested in the listing. (DSMF ¶ 9; PRDSMF ¶ 9.) According to Mr. Juhl, he observed that: (1) the family room had no furniture and, except for a few papers lying on the floor, was empty; (2) the breakfast area had a small table and chairs; (3) the kitchen had some silverware in the drawers, and all of the cabinets had been partially emptied; (4) the garage contained many items that looked as if they had been simply tossed in or rummaged through; (5) the master bedroom had only a bed frame, and the closets contained no clothes; and (6) none of the other bedrooms had furniture. (DSMF ¶ 10; PRDSMF ¶ 10 (admitting that the Court can consider this statement, but arguing that it contradicts other evidence).) According to Mr. Juhl, the utilities were not on, and a hot water tank was leaking into the laundry room. (DSMF ¶ 11; PRDSMF ¶ 11.) In Mr. Juhl's opinion, the Property appeared to be uninhabited, and, because it had no utilities, was uninhabitable. (Decl. of Jerry Juhl (Docket Entry No. 113–3) ¶ 5.) Mr. Juhl averred that he visited the Property on two more occasions, and that, on each occasion, "the conditions remained the same as [he] observed during [his] initial visit on or around December 12, 2012." (*Id.* ¶ 6.)

### 2. The Foreclosure

On February 5, 2013, Chase foreclosed on the Property. (DSMF ¶ 14; PRDSMF ¶ 14.) Chase then transferred the Property to Defendant Fannie Mae. (DSMF ¶ 15; PRDSMF ¶ 15.)

### 3. Chris Singleton and His General Practices

Shortly after the foreclosure of the Property, Defendant Fannie Mae hired Chris Singleton, a Realtor affiliated with Defendant Whitman, to perform preservation services on the Property. (Decl. of Chris Singleton (Docket Entry No. 113–1) ¶ 3; Dep. of Chris Singleton (Docket Entry No. 43) at 19; PSMF ¶ 41, as modified per DRPSMF ¶ 41.) Defendant Whitman is a corporation that does business as "A Plus Realty Georgia." (Decl. of Cory Whitman (Docket Entry No. 113–2) ¶ 2; PSMF ¶ 8; DRPSMF ¶ 8.)[2] According to Defendant Whitman, Mr. Singleton is an independent contractor who "receives a 1099 tax form from [Defendant] Whitman at the end of the year." (Whitman Decl. ¶ 4; *see also* Singleton Decl. ¶ 3.) Mr. Singleton does not receive a W–2 from Defendant Whitman, and Defendant Whitman does not withhold taxes for him. (Whitman Decl. ¶ 4; Singleton Decl. ¶ 3; DSMF ¶ 20; PRDSMF ¶ 20.) According to Defendant Whitman, Mr. Singleton performs all his duties without direct supervision from Defendant Whitman, and he contacts Defendant Whitman's owner for guidance only if a particular issue arises concerning a listing. (Whitman Decl ¶ 5.) Defendant Whitman notes that it does not reimburse Mr. Singleton for services relating to the listing, such as rekeying a property or marketing a property for sale. (Whitman Decl. ¶ 5; DSMF ¶ 23; PRDSMF ¶ 23.) According to Defendant Whitman, "[a]ll bills related to the listing are processed and paid by [Defendant] Whitman and not by Mr. Singleton." (Whitman Decl. ¶ 5.)

Defendant Whitman and Defendant Fannie Mae have a Master Listing Agreement under which Defendant Whitman, as

---

**2.** For purposes of this lawsuit, Defendant Whitman is identical to A Plus Realty Geor-

gia. (PSMF ¶ 9; DRPSMF ¶ 9.)

broker, agrees to manage and sell Defendant Fannie Mae's properties under Defendant Fannie Mae's sales guide. (Master Listing Agreement (Docket Entry No. 126–1) at 5–6; PSMF ¶ 10; DRPSMF ¶ 10 (stating that the document speaks for itself).) Under that Master Listing Agreement, Defendant Whitman, as broker, warrants that all subcontractors will follow the policies and procedures contained in the sales guide. (Master Listing Agreement at 18–19; PSMF ¶ 11, as modified per DRPSMF ¶ 11 (admitting that the document speaks for itself and denying that Mr. Singleton is a subcontractor).) The Master Listing Agreement states that brokers shall be responsible for the conduct of their subcontractors, and requires brokers to manage their personnel and subcontractors. (Master Listing Agreement at 18–19.) If a broker's personnel do not observe best industry practices, the broker will be subject to termination. (*Id.*)

Defendant Fannie Mae's Sales Guide also requires brokers and their personnel to learn and follow all applicable laws. (Sales Guide (Docket Entry No. 126–2) at 10–11.) The Sales Guide provides that, if a broker is uncertain about the value of personal property or suspects that the property may be sentimental, the broker must photograph and inventory the personal property, and must confer with Defendant Fannie Mae. (*Id.* at 36, 41–42.) The Sales Guide requires brokers to update all occupancy changes. (*Id.* at 41, 43, 46.) According to the Sales Guide, "misrepresenting available options for tenants" in a Knowing Your Options notice ("KYO flyer") is a potential example of fraud. (*Id.* at 11.)

In late 2011, Mr. Singleton began receiving postforeclosure listings from Defendant Fannie Mae. (DSMF 17; PRDSMF ¶ 17.) Defendant Fannie Mae sent listings directly to Mr. Singleton, even though the listing brokerage stated "A Plus Realty Georgia." (DSMF ¶ 18; PRDSMF ¶ 18; Singleton Decl. ¶ 4.) Mr. Singleton then served as the property manager and listing agent for the assigned property. (Singleton Decl. ¶ 4.) If a property owned by Defendant Fannie Mae is sold, Defendant Whitman generally receives a 2.5 percent commission from the sales price, and Mr. Singleton, in turn, receives a percentage of that commission as his sales commission. (DSMF ¶ 24; PRDSMF ¶ 24.) Defendant Whitman only gets paid by Defendant Fannie Mae if and when a Defendant Fannie Mae property sells, and Defendant Singleton only gets paid for sales of Defendant Fannie Mae properties once the properties sell and Defendant Whitman receives a commission. (Singleton Dep. at 67, 71; PSMF ¶¶ 33–34; DRPSMF 33–34.) During the time period relevant to this action, Mr. Singleton was managing between fifteen and twenty Defendant Fannie Mae properties each month. (Singleton Dep. at 20; PSMF ¶ 25; DRPSMF ¶ 25.)[3] Mr. Singleton does not have a contractual relationship with Defendant Fannie Mae, and he answers to Defendant Whitman for his actions. (PSMF ¶¶ 20–21; DRPSMF ¶¶ 20–21.)

Defendant Fannie Mae provided Mr. Singleton with its REO Sales Guide. (Singleton Decl. ¶ 5; Singleton Dep. at 24–25, 61; PSMF ¶ 27; DRPSMF ¶ 27.) The REO Sales Guide includes, among other things, instructions to determine whether a property is vacant and Defendant Fannie Mae's procedures for re-keying properties. (Singleton Decl. ¶ 5.) Mr. Singleton testified that he works within the scope of

---

**3.** Mr. Singleton sustained this volume for approximately a year and a half. (PSMF ¶ 26; DRPSMF ¶ 26.)

Defendant Fannie Mae's guidelines and that he upholds Defendant Fannie Mae's rules and directives. (Singleton Dep. at 62–63; PSMF ¶ 24; DRPSMF ¶ 24.)

Generally, after receiving a property assignment from Defendant Fannie Mae, Mr. Singleton researches the assigned property, including searching for the property in the listing service databases, pulling the tax record for the property, and confirming the property's address. (Singleton Decl. ¶ 6.) Mr. Singleton then generally visits the assigned property to determine whether the property is vacant. (*Id.*) If Mr. Singleton determines that the property is not vacant—that is, that people or personal property remains—he informs Defendant Fannie Mae of this assessment through its automated online system, AMN, which will refer the property to an attorney to file a dispossessory or eviction action. (*Id.* ¶ 6; Singleton Dep. at 27; PSMF ¶ 36; DRPSMF ¶ 36.) If Mr. Singleton determines that the property is vacant, he informs Defendant Fannie Mae of that assessment through AMN and notifies a contractor with Defendant Asset Management Services, LLC ("Defendant AMS") to re-key the property. (Singleton Decl. ¶ 6.) In either situation, Mr. Singleton posts a KYO notice on the door. (Singleton Decl. ¶ 6; PSMF ¶ 40; DRPSMF ¶ 40.) Once the re-keying process is completed for a vacant property, Mr. Singleton informs Defendant Fannie Mae of that fact through AMN, which, in turn, automatically contacts Defendant AMS to assign a local crew to perform a trash-out and clean up of the assigned property. (Singleton Decl. ¶ 7; Singleton Dep. at 29; PSMF ¶ 37; DRPSMF ¶ 37.) Mr. Singleton does not attend a trash-out and clean up performed by AMS. (Singleton Decl. ¶ 17.)

After a trash-out, Mr. Singleton inspects the property to ensure that it is clean to Defendant Fannie Mae's standards. (Sin-gleton Dep. at 31; PSMF ¶ 38; DRPSMF ¶ 38.) Following a trash-out of a Defendant Fannie Mae property, Defendant Whitman lists the Property for sale. (Singleton Dep. at 68; PSMF ¶ 35; DRPSMF ¶ 35.)

#### 4. The Trash–Out

Mr. Singleton proceeded with the Property's assignment in accordance with Defendant Fannie Mae's guidelines and his own usual business practices. (DSMF ¶ 25; PRDSMF ¶ 25.) Mr. Singleton first located the Propertyon the Georgia Multiple Listing Service and the First Multiple Listing Service, which listed the Property as "VACANT." (DSMF ¶ 26; PRDSMF ¶ 26.) According to Mr. Singleton, the pictures for the listing showed a vacant residence with no furniture, other than what appeared to be a chair in one of the rooms. (Singleton Decl. ¶ 9.)

At 8:00 p.m. on February 8, 2013, Mr. Singleton posted a KYO flyer on the Property's front door. (DSMF ¶ 28; PRDSMF ¶ 28; Singleton Dep. at 39; PSMF ¶ 42, as modified per DRPSMF ¶ 42.) Angela Ervin, another licensed Realtor affiliated with Defendant Whitman, accompanied Mr. Singleton to the Property for safety and to act as a witness. (DSMF ¶ 29, as modified per PRDSMF ¶ 29; Singleton Decl. ¶ 10.)

According to Mr. Singleton, when he visited the Property on February 8, 2013, he observed: (1) the gas meter was locked; (2) there were no lights on, including the light on the doorbell; (3) the grass was tall and unkempt; and (4) no one answered the door. (DSMF ¶ 30; PRDSMF ¶ 30; Singleton Decl. ¶ 10.) Plaintiff contends that the grass was due to be mowed on the day after the trash-out. (PRDSMF ¶ 30.) Mr. Singleton advised Defendant Fannie Mae through the AMN system that the Property was vacant, and arranged to meet with Clint Aiola, who worked with Defendant AMS. (Singleton Decl. ¶ 11.) Mr. Single-

ton made the determination that the Property was vacant. (Singleton Dep. at 18; PSMF ¶ 28; DRPSMF ¶ 28.)

Mr. Singleton returned to the Property with Mr. Aiola a few days later. (DSMF ¶ 32; PRDSMF ¶ 32; PSMF ¶ 43; DRPSMF ¶ 43.) According to Mr. Singleton, he and Mr. Aiola walked through the Property and observed that the garage had open boxes and that clothes and other debris were on the garage floor. (DSMF ¶ 32; PRDSMF ¶ 32.) Mr. Singleton recalled that the garage looked as though it had been ransacked, that there was no furniture inside the Property, and that neither he nor Mr. Aiola believed that the personal property present at the Property exceeded a value even remotely approaching $500 in garage sale value. (Singleton Decl. ¶ 12; Singleton Dep. at 64–66; PSMF ¶ 29; DRPSMF ¶ 29.) Mr. Singleton did not open all of the boxes in the Property's garage, but he contends that most of the boxes were open already and he could see what was inside or strewn around the garage. (Singleton Dep. at 45; PSMF ¶ 30, as modified per DRPSMF ¶ 30.) Mr. Singleton acknowledged that he could call Defendant Fannie Mae's representatives if he has questions or concerns over Defendant Fannie Mae's guidelines. (Singleton Dep. at 61–62; PSMF ¶ 31; DRPSMF ¶ 31.) Under Defendant Fannie Mae's guidelines, Defendant Singleton determines that legal process is not required if a Property contains items worth less than $500. (Singleton Dep. at 25, 63–64, 66.)

On February 11, 2013, Mr. Singleton gave Mr. Aiola the go-ahead to re-key the Property. (DSMF ¶ 31; PRDSMF ¶ 31; Singleton Dep. at 37; PSMF ¶ 39; DRPSMF ¶ 39.) Mr. Aiola re-keyed the Property, and Mr. Singleton notified Defendant Fannie Mae of the re-keying through the AMN system. (Singleton Decl. ¶ 12; Singleton Dep. at 37; PSMF ¶¶ 39, 43, 45; DRPSMF ¶¶ 39, 43, 45.) The AMN system notified Defendant AMS to conduct a trash-out and clean up. (Singleton Dep. at 37; PSMF ¶ 45; DRPSMF ¶ 45.)

On February 13, 2013, Mr. Aiola removed all of the personal property from the Property. (DSMF ¶ 36, as modified per PRDSMF ¶ 36; PSMF ¶ 46; DRPSMF ¶ 46.) Mr. Singleton was not present on the day of the trash-out, and did not personally direct the removal of items from the Property. (DSMF ¶ 38, as modified per PRDSMF 38.) Mr. Singleton did not contact Plaintiff's listing agent. (Singleton Dep. at 53; PSMF ¶ 47; DRPSMF ¶ 47.) Defendant Whitman contends that it did not oversee any of Mr. Singleton's actions concerning the Property, and that it and its employees did not visit the Property or provide reports to Defendant Fannie Mae. (Whitman Decl. ¶ 8.)

During the week after the foreclosure, Mr. Karangu called Mr. Singleton, asking where his lockbox was. (Singleton Dep. at 55; PSMF ¶ 48; DRPSMF 48.) Mr. Karangu appeared at the Property to get his lockbox while the crew was conducting the trash-out. (Singleton Dep. at 56.) According to Mr. Karangu, he told the crew that it was not supposed to be removing items from the Property because the Property had just been foreclosed. (Karangu Dep. at 92–93; PSMF ¶ 50; DRPSMF ¶ 50.) Mr. Karangu testified that, on that date, he saw Plaintiffs jewelry in an open box, lawnmowers, a couch, a dining room set, a china cabinet, and a stereo set at the Property. (Karangu Dep. at 50–51, 70, 103; PSMF ¶ 51; DRPSMF ¶ 51.) Mr. Karangu further recalls seeing most of Plaintiff's couch, her clothes, and boxes and boxes of Plaintiffs other things in a dumpster. (Karangu Dep. at 102; PSMF

¶ 52; DRPSMF ¶ 52.) Mr. Karangu took photographs of the garage and dumpsters on the day of the trash-out. (PSMF ¶ 53; DRPSMF ¶ 53.)

According to Mr. Karangu, he asked Mr. Singleton to stop the trash-out. (Karangu Dep. at 93; PSMF ¶ 54; DRPSMF ¶ 54.) Mr. Singleton acknowledges that Mr. Karangu contacted him on February 13, 2013, but does not recall that Mr. Karangu asked him to halt the trash-out. (Singleton Dep. at 56–57; PSMF ¶ 55, as modified per DRPSMF ¶ 55.) Mr. Singleton did not inform Defendant Fannie Mae of this conversation or upload notes of this conversation to Defendant Fannie Mae's AMN system, although he reported that Plaintiff called him on February 19, 2013, demanding the return of her personal belongings. (AMN Notes (Docket Entry No. 126–4); PSMF ¶ 56; DRPSMF ¶ 56.) According to Defendant Fannie Mae's representative, Mr. Singleton's failure to report one conversation, but not the other, is "concerning." (PSMF ¶ 57; DRPSMF ¶ 57.)

After the trash-out, and during attempts to market the Property for sale on behalf of Defendant Fannie Mae, Mr. Singleton observed that the water heater leaked, that a portion of water pipe underneath the sink had been removed, that the water line at the water meter leaked, and that the main floor furnace had a gas leak. (DSMF ¶ 41; PRDSMF ¶ 41.) According to Mr. Singleton, at the time of the trash-out, he "believed in good faith that the previous owner moved and took all of their possessions with them except for a few items of no value in the house including an old tube-type TV, damaged dresser, damaged chair, and debris on the garage floor including clothing and open empty boxes." (Singleton Decl. ¶ 15.) Mr. Singleton contends that "[i]f there had been any items of value left in the Property or if [he] in good faith believed that the Property was occupied, [he] would not have reported the Property as vacant to [Defendant] Fannie Mae through the AMN system." (Id. ¶ 16.)

### 4. Plaintiff's Property

Plaintiff admits that she has no receipts for any of the items that she claims were removed in the trash-out. (DSMF ¶ 45; PRDSMF ¶ 45.) Plaintiff last claims to have visited the Property sometime in January 2013. (DSMF ¶ 46; PRDSMF ¶ 46.) According to Plaintiff, she visited the Property in January 2013 with her friend, Ms. Wanjira, and her own infant child, with no utilities on inside the Property. (DSMF ¶ 47; PRDSMF ¶ 47.)

Plaintiff contends that she intended to return to the Property and retrieve her personal items. (Pl. Dep. Vol. I at 234–35; PSMF ¶ 58; DRPSMF ¶ 58.) Plaintiff testified that she never consented to Defendants changing her locks or removing her personal items. (Pl. Dep. Vol. I at 234–35; PSMF ¶ 59; DRPSMF ¶ 59.)

### 5. No Eviction Proceedings

Defendant Fannie Mae never obtained a Writ of Possession from any Paulding County, Georgia, court concerning the Property, either before or after Mr. Aiola rekeyed the Property or before or after the trash-out. (Def. Fannie Mae's Resp. Pl.'s Req. Admission No. 7 (Docket Entry No. 33–2); PSMF ¶¶ 44, 60; DRPSMF ¶¶ 44, 60.)

### B. Procedural Background

The Court incorporates the procedural background portions of its earlier Orders into this Order as if set forth fully herein, and adds only those procedural background facts that are relevant to the instant Order. (Orders of Mar. 9, 2015 (Docket Entry Nos. 68–69).) On December 17, 2015, Defendant Whitman filed its Motion for Summary Judgment. (Docket

Entry No. 113.) The briefing process for that Motion is complete, and the Court finds that the matter is ripe for resolution.

## II. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) allows a court to grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). The party seeking summary judgment bears the initial burden of showing the Court that summary judgment is appropriate and may satisfy this burden by pointing to materials in the record. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir.2012). Once the moving party has supported its motion adequately, the burden shifts to the non-movant to rebut that showing by coming forward with specific evidence that demonstrates the existence of a genuine issue for trial. *Id.*

When evaluating a motion for summary judgment, the Court must view the evidence and draw all reasonable factual inferences in the light most favorable to the party opposing the motion. *Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013); *Strickland*, 692 F.3d at 1154. The Court also must " 'resolve all reasonable doubts about the facts in favor of the non-movant.' " *Morton*, 707 F.3d at 1280 (internal quotation marks and citations omitted). Further, the Court may not make credibility determinations, weigh conflicting evidence to resolve disputed factual issues, or assess the quality of the evidence presented. *Strickland*, 692 F.3d at 1154. Finally, the Court does not make factual determinations. *Rich*, 716 F.3d at 530.

## III. Discussion

### A. Duty to File Dispossessory Action

Defendant Whitman argues that it had no duty to file a dispossessory action be-cause it was not the owner of the Property, and that it cannot be liable for damages flowing as a result from the wrongful eviction. (Def. Whitman's Br. Supp. Mot. Summ. J. (Docket Entry No. 113–4) at 11–13.) Plaintiff acknowledges that Defendant Whitman had no duty to file a dispossessory action. (Pl.'s Resp. Def. Whitman's Mot. Summ. J. (Docket Entry No. 126) at 21–22.) Plaintiff argues, however, that Defendant Whitman might still be liable for the handling of Plaintiff's property separate and apart from Defendant Whitman's compliance with statutory dispossessory procedures. (*Id.*)

The Georgia Court of Appeals has observed that, although a landlord may accomplish its statutory duty to dispossess a tenant through Georgia's dispossessory procedure "through his attorney or agent, ... a landlord cannot absolve himself from liability by delegating those duties to an independent contractor." *Ikomoni v. Executive Asset Mgmt., LLC*, 309 Ga.App. 81, 84, 709 S.E.2d 282, 286 (2011). Further, "where a party has a nondelegable duty imposed by statute, an independent contractor cannot be held liable for failing to carry out that statutory duty on its own." *Id.* at 84, 709 S.E.2d at 286. Thus Defendant Fannie Mae, as the legal title holder of the Property post-foreclosure, had the duty to comply with the statutory dispossessory procedures, if applicable, and it could not delegate those duties to a third party. As a result, if Defendant Whitman was an independent contractor, it "had no separate legal duty to file a dispossessory action and comply with the statutory procedures applicable in such an action." *Id.* at 84, 709 S.E.2d at 286. Defendant Whitman thus would not be liable for wrongful eviction and trespass claims arising solely from the alleged fail-

ure to file a dispossessory action. *Id.* at 84, 709 S.E.2d at 286. Plaintiff, however, also alleges that Defendant Whitman is liable for its alleged handling of Plaintiff's personal property, distinct and apart from the compliance, or noncompliance with, statutory dispossessory procedures. *Id.* at 84 n. 2, 709 S.E.2d at 286 n. 2. Thus, if Defendant Whitman is responsible for Mr. Singleton's actions, Defendant Whitman could be liable for conversion, negligence, and trespass, as the evidence is sufficient to allow a jury to find that Mr. Singleton converted Plaintiffs personal property, that Mr. Singleton was negligent, and that Mr. Singleton trespassed by refusing to stop the trash-out after Mr. Karangu's call or by interfering with Plaintiff's access to her personal property by having the Property re-keyed. The Court therefore cannot grant summary judgment to Defendant Whitman based on this argument.

### B. Independent Contractor

Next, Defendant Whitman argues that it is not responsible for any allegedly wrongful conduct on the part of Mr. Singleton because Mr. Singleton was an independent contractor. (Def. Whitman's Br. Supp. Mot. Summ. J. at 13–14.)

O.C.G.A. § 51–2–4 provides: "An employer generally is not responsible for torts committed by his employee when the employee exercises an independent business and in it is not subject to the immediate direction and control of the employer." O.C.G.A. § 51–2–4. O.C.G.A. § 51–2–5, however, sets forth exceptions to the general rule, and states:

An employer is liable for the negligence of a contractor:

(1) When the work is wrongful in itself or, if done in the ordinary manner, would result in a nuisance;

(2) If, according to the employer's previous knowledge and experience, the work to be done is in its nature dangerous to others however carefully performed;

(3) If the wrongful act is a violation of a duty imposed by express contract upon the employer;

(4) If the wrongful act is the violation of a duty imposed by statute;

(5) If the employer retains the right to direct or control the time and manner of executing the work or interferes and assumes control so as to create the relation of master and servant or so that an injury results which is traceable to his interference; or

(6) If the employer ratifies the unauthorized wrong of the independent contractor.

O.C.G.A. § 51–2–5. "The issue in determining whether one was an employee or an independent contractor is whether the employer retained the right to exercise control over the time, place or manner of the work performed." *BellSouth Telecomms., Inc. v. Helton,* 215 Ga.App. 435, 435, 451 S.E.2d 76, 78 (1994) (internal quotation marks and citation omitted). "Where the contract of employment clearly denominates the other party as an independent contractor, that relationship is presumed to be true unless the evidence shows that the employer assumed such control." *Id.* at 435, 451 S.E.2d at 78 (internal quotation marks and citation omitted). Whether an individual or company is an independent contractor generally is a question of fact. *Slater v. Canal Wood Corp. of Augusta,* 178 Ga.App. 877, 878, 345 S.E.2d 71, 72 (1986).

The Georgia courts have recognized that an employer–employee relationship will not arise simply because the employer "has merely a general right to order the work stopped or resumed, to

inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations." *Slater*, 178 Ga.App. at 880, 345 S.E.2d at 74. Instead, for an employer-employee relationship to arise, "[t]here must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." *Id.* at 880, 345 S.E.2d at 74; *see also Ga. Messenger Serv., Inc. v. Bradley*, 311 Ga.App. 148, 149, 715 S.E.2d 699, 702 (2011) ("The test for determining whether an employer is exercising a degree of control over an independent contractor's work such that the law will deem the independent contractor to be a servant of that employer—thus making the employer vicariously liable for any wrongful acts committed by the contractor—is whether the contract gives, or the employer assumes, the right to control the time, manner, and method of the performance of the work, as distinguished from the right to merely require certain definite results in conformity with the contract." (internal quotation marks, citation, and footnote omitted)).

 The Court recognizes that real estate agents are generally considered to be independent contractors for their respective brokerages. *See Mark Six Realty Assocs., Inc. v. Drake*, 219 Ga.App. 57, 58, 463 S.E.2d 917, 918 (1995) ("In a more typical business arrangement with a realtor or broker, a real estate salesperson clearly occupies the position of an independent contractor."). Defendant Whitman has presented evidence indicating that Mr. Singleton may be an independent contractor. However, as Plaintiff correctly points out, Defendant Fannie Mae's contract was with Defendant Whitman, not Mr. Singleton. Defendant Fannie Mae's Master Listing Agreement with Defendant Whitman required Defendant Whitman to exercise considerable control over the time, manner, and method of Mr. Singleton's work, mandated that Defendant Whitman and its subcontractors comply with the requirements of Defendant Fannie Mae's Sales Guide, and held Defendant Whitman responsible for its subcontractors and personnel. Under those circumstances, the evidence, viewed in the light most favorable to Plaintiff as the nonmovant, creates a genuine dispute as to whether Mr. Singleton was an independent contractor of Defendant Whitman. *See Mark Six Realty Assocs., Inc.*, 219 Ga.App. at 58–59, 463 S.E.2d at 919–20 (concluding that evidence existed that would allow a jury to determine that a real estate agent was not an independent contractor of a brokerage, where the evidence indicated that the brokerage retained the right to, and did, exercise control over the time, manner, and method in which the real estate agent performed her duties). The Court therefore denies this portion of Defendant Whitman's Motion for Summary Judgment.[4]

### C. Abandonment

 Next, Defendant Whitman argues that Defendant Fannie Mae was not

---

**4.** In its reply, Defendant Whitman argues for the first time that Plaintiff cannot hold it liable under O.C.G.A. § 51–2–5(3) for alleged violations of the contracts with Defendant Fannie Mae, because Plaintiff was not a party to those contracts. (Def. Whitman Reply Supp. Mot. Summ. J. (Docket Entry No. 135) at 5–6.) Defendant Whitman waived that argument by waiting until its reply brief to raise it. *Obester v. Lucas Assocs., Inc.*, Civil Action File No. 1:08–CV–03491–MHS–AJB, 2010 WL 8292401, at *42 (N.D.Ga. Aug. 2, 2010); *see also In re Egidi*, 571 F.3d 1156, 1163 (11th Cir.2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."). The Court further observes that it cannot have come as a surprise to Defendant Whitman that Plaintiff would make this contention.

required to follow any statutory dispossessory procedures because Plaintiff abandoned her personal property. (Br. Supp. Def. Whitman's Mot. Summ. J. at 15–18.) Under Georgia law, "[t]he exclusive method whereby a landlord may evict a tenant is through a properly instituted dispossessory action filed pursuant to O.C.G.A. § 44–7–50 et seq." *Ikomoni*, 309 Ga.App. at 84, 709 S.E.2d at 286 (internal quotation marks and citation omitted); *see also Roberts v. Roberts*, 205 Ga.App. 371, 372, 422 S.E.2d 253, 254 (1992) ("Unlike the situation that existed at common law, the exclusive method available today whereby a landlord may evict a tenant is the legal process set forth in O.C.G.A. § 44–7–50, and a landlord who seeks forcibly to evict a tenant by extralegal means may be liable to the tenant in damages, notwithstanding that the tenant is behind in rental payments.").[5] "After instituting a dispossessory action and obtaining a writ of possession, the landlord is authorized to evict the tenant, but the landlord must plac[e] the tenant's property on some portion of the landlord's property or on other specific property designated by the landlord and approved by the executing officer." *Ikomoni*, 309 Ga.App. at 84, 709 S.E.2d at 286 (alteration in original) (internal. quotation marks and citation omitted). "If the landlord evicts a tenant without filing a dispossessory action and obtaining a writ of possession, or without following the dispossessory procedures for handling the tenant's personal property, the landlord can be held liable for wrongful eviction and trespass." *Id.*; *see also Owens v. BarclaysAmerican/Mortg. Corp.*, 218 Ga.App. 160, 162, 460 S.E.2d 835, 838 (1995) ("If the owner forcibly [dispossesses] a tenant without following [the procedures in O.C.G.A. § 44–7–50], the owner is subject to an action for trespass." (first alteration in original) (internal quotation marks and citation omitted)); *Swift Loan & Fin. Co., Inc. v. Duncan*, 195 Ga.App. 556, 557, 394 S.E.2d 356, 358 (1990) ("A landlord can be subject to an action for trespass because his remedy for taking repossession of the premises is codified at O.C.G.A. § 44–7–50. . . . A landlord may not forcibly dispossess a tenant without subjecting himself to an action for trespass even if the tenant is holding over beyond his term, is in arrears in his rent, and has received legal notice to vacate.").

 "Where former owners of real property remain in possession after a foreclosure sale, they become tenants at sufferance." *Bellamy v. F.D.I.C.*, 236 Ga.

---

5. O.C.G.A. § 44–7–50(a) provides:

In all cases where a tenant holds possession of lands or tenements over and beyond the term for which they were rented or leased to the tenant or fails to pay the rent when it becomes due and in all cases where lands or tenements are held and occupied by any tenant at will or sufferance, whether under contract of rent or not, when the owner of the lands or tenements desires possession of the lands or tenements, the owner may, individually or by an agent, attorney in fact, or attorney at law, demand the possession of the property so rented, leased, held, or occupied. If the tenant refuses or fails to deliver possession when so demanded, the owner or the agent, attorney at law, or attorney in fact of the owner may immediately go before the judge of the superior court, the judge of the state court, or the clerk or deputy clerk of either court, or the judge or the clerk or deputy clerk of any other court with jurisdiction over the subject matter, or a magistrate in the district where the land lies and make an affidavit under oath to the facts. The affidavit may likewise be made before a notary public, subject to the same requirements for judicial approval specified in Code Section 18–4–61, relating to garnishment affidavits. O.C.G.A. § 44–7–50(a).

App. 747, 750, 512 S.E.2d 671, 675 (1999). "[A] landlord-tenant relationship exists between a legal title holder and a tenant at sufferance such that the dispossessory procedures set forth in O.C.G.A § 45–7–50 et seq. are applicable." *Ikomoni,* 309 Ga. App. at 84, 709 S.E.2d at 286 (internal quotation marks, citation and footnote omitted); *see also Cloud v. Ga. Cent. Credit Union,* 214 Ga.App. 594, 597, 448 S.E.2d 913, 916 (1994) (noting that former owners who remained in possession after foreclosure were tenants at sufferance subject to being dispossessed).

 The Georgia courts, however, have "held that when a former owner yields possession of the property at some point after the [foreclosure] sale, but then later reenters the property, he is an intruder." *Steed v. Fed. Nat'l Mortg. Corp.,* 301 Ga. App. 801, 805, 689 S.E.2d 843, 848 (2009) (citing *Durden v. Clack,* 94 Ga. 278, 21 S.E. 521 (1984)). Thus, "if a former owner is not in possession of the property at the time of the foreclosure sale or subsequently goes out of possession, but then later reenters the property aware that a foreclosure sale has already taken place, the former owner is a mere intruder, and the legal title holder is not required to follow the dispossessory procedures set forth in O.C.G.A. § 44–7–50 et seq." *Id.* at 806, 689 S.E.2d 843, 848, 301 Ga.App. at 848, 689 S.E.2d 126; *see also Stevens v. Way,* 167 Ga.App. 688, 689, 307 S.E.2d 507, 509 (1983) ("[T]he relationship of landlord and tenant must exist before a dispossessory hearing can be held under O.C.G.A. § 44–7–50[.]"). Following that authority, Defendant Fannie Mae did not violate O.C.G.A. § 44–7–50 if Plaintiff abandoned the Property. *Vakili v. Wells Fargo Home Mortg., Inc.,* No. CV 212–104, 2013 WL 3868170, at *4 (S.D.Ga. July 24, 2013).

 The evidence, viewed in the light most favorable to Plaintiff as a non-movant, creates a genuine dispute as to whether Plaintiff abandoned the Property. Further, adopting Defendant Whitman's view of the evidence would require the Court to make credibility determinations and weigh evidence, two tasks that the Court cannot undertake at the summary judgment stage. This argument therefore does not entitle Defendant Whitman to summary judgment.

### D. Section 9 of the Security Deed

 Next, Defendant Whitman argues that Section 9 of the Security Deed allowed Defendant Fannie Mae to secure the Property and to perform a trash-out. (Def. Whitman's Br. Supp. Mot. Summ. J. at 18–20.) That provision states, in relevant part:

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property (as set forth below). Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and

(c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, making repairs, replacing doors and windows, draining water from pipes, and eliminating building or other code violations or dangerous conditions. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

(Security Deed § 9.) Certainly, "Georgia law recognizes that [t]he common law right to the exclusive use and possession of property may be modified by agreement, in which the landowner grants permission to enter his property under certain circumstances." *Bates v. JPMorgan Chase Bank, NA,* 768 F.3d 1126, 1134 (11th Cir. 2014) (alteration in original) (internal quotation marks and citation omitted). As previously noted, however, a genuine dispute remains as to whether Plaintiff abandoned the Property. Thus, a genuine dispute would remain as to whether Section 9 of the Security Deed would permit Defendant Fannie Mae to enter the Property and conduct the trash-out. Further, the Court agrees with Plaintiff that it is questionable whether Section 9 of the Security Deed would apply to post-foreclosure proceedings. Instead, it appears that Section 22 of the Security Deed governs post-

foreclosure proceedings. (Security Deed § 22.) That section does not specifically grant an immediate right of entry. (*Id.*) Instead, it provides, in relevant part:

> If the Property is sold pursuant to this Section 22, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at sale. If possession is not surrendered, Borrower or such person shall be a tenant holding over and may be dispossessed in accordance with Applicable Law.

(*Id.*) Thus, Section 22 would seem to require Defendant Fannie Mae to comply with Georgia's statutory dispossessory procedures unless Plaintiff had abandoned the Property. Given the Court's conclusion *supra* Part III.C. that a genuine dispute remains as to abandonment, the Court cannot find as a matter of law that the Security Deed authorized Defendant Fannie Mae to enter the Property and conduct a trash-out.[6] Defendant Whitman thus is not entitled to summary judgment based on this argument.

### E. Attorney's Fees and Punitive Damages

Finally, Defendant Whitman argues that Plaintiff's claims for attorney's fees and punitive damages necessarily fail because none of Plaintiff's underlying claims can survive summary judgment. (Def. Whitman's Br. Supp. Mot. Summ. J. at 20–21.) As discussed *supra* Parts III.A.-D., a gen-

---

**6.** In reaching this conclusion, the Court disagrees with the portion of *Carter v. Butts County, Georgia,* 110 F.Supp.3d 1325 (M.D.Ga.2015), finding that paragraph 9 of a security deed modified a borrower's exclusive right to possession of a piece of property and allowed agents of a lender to enter the property and begin cleaning out the property.

1342–43. Importantly. *Carter* made that finding in connection with a summary judgment motion in the context of a § 1983 wrongful arrest claim, ultimately concluding that a genuine dispute remained as to whether probable cause existed to arrest the plaintiffs.

uine dispute remains as to at least some of Plaintiff's underlying claims. Moreover, for the reasons set forth in the Court's Order addressing Defendant AMS's Motion for Summary Judgment, a genuine dispute remains as to whether Defendants acted in bad faith and whether their conduct would support a punitive damages award. The Court therefore denies this portion of Defendant Whitman's Motion for Summary Judgment.

## IV. Conclusion

ACCORDINGLY, the Court **DENIES** Defendant Whitman's Motion for Summary Judgment [113].

IT IS SO ORDERED.